All right, counsel, you may proceed. Thank you, your honor. My name is Steven Robbins. I am the pro bono counsel for the petitioner in this case, Mr. Amaral, and I would like to reserve three minutes for rebuttal. All right. I wanted to start briefly with the issue of jurisdiction, which the respondent has brought up in their brief and by way of motion. And in this case, I think it's a fairly simple issue that's been resolved by precedent, both at the Supreme Court and also by this court in Del Cid, Marroquin, which reads, this court held specifically that in cases just like this, DHS has a mechanism in place to return people if the petition for review is granted, if they're successful on their petition for review. And importantly, I think, petitioners like Mr. Amaral rely on this precedent when making a complicated decision, frankly, of continuing with prolonged, potentially indefinite detention. And in Mr. Amaral's case, it was at the height of the pandemic. He was in isolation to avoid issues with people who might've perceived him as a gang member. And he had to make that decision about whether or not to remain in those conditions or to lift his stay of removal and to be removed. And he did so- We'll hear from the government, but Del Cid, the Marroquin, relied on two different policy items in making its decision that the case was in moot. One was the ICE policy directive 11061.1, and the other was an April 5th, 2016 letter brief. And those policy directives said different things. And so hence our question to the government, but also you can weigh in on whether those policy directives are in effect. Del Cid didn't say it was not moot because we've determined it's good policy. It was relying specifically on the government's policy, which of course can change from time to time. So do you have information about the current status of ICE policy? As far as I know, those memos and those policies are still in place. And I guess I'll leave that issue to the government during their time to respond. Setting aside the jurisdictional issue, this case really comes down to the factual findings and whether substantial evidence supports the findings of the agency. I laid out most of this in my brief, but I do think that one thing that the agency clearly engaged in that we can point to as being misstating the record or failing to mention highly probative or potentially dispositive evidence is when the immigration judge engaged in cherry picking and really dissecting individual sentences from the State Department Human Rights Report. Now, it's normal when we cite something as jurists or as lawyers, that if the second half of a sentence says something that's sort of irrelevant to the point we're trying to make, you might cut it off. And there's ways of doing that. We've all read the blue book. But in this case, what the judge is doing and what the BIA repeats is dissecting portions of sentences that undermine their factual findings. And so I'd like to just read a paragraph. It's from page 444. It's from the State Department of the Administrative Record from the State Department's Human Rights Report. What it reads in its totality is that although authorities generally maintained effective control over security forces, there were instances in which elements of security forces acted independent of civilian control. Significant human rights issues included reports of the involvement by police, military, and other government officials and illegal armed groups and unlawful or arbitrary killings forced disappearance and torture, harsh and life-threatening prison conditions in some prisons, impunity for violence against human rights defenders and journalists, violence targeting persons with disabilities, lesbian, gay, bisexual, transgender, and intersex persons. That's the quote in its entirety. And the judge took that first sentence and cut it in half and just said authorities generally maintained effective control over security forces. Now he does this again in his decision when he cites, again, the State Department, and he says in his decision, federal law prohibits arbitrary arrests and detention and provides for the right of any person to challenge the lawfulness of his or her arrest or detention in court, which sounds pretty good, but there's more to that sentence. He doesn't have to go a paragraph later or turn three or four pages to get there. It's literally in the same sentence that says, but the government sometimes failed to observe these requirements. And something that happens in the board's decision is they take these snippets from the judge and they sort of mash them together into one very convenient paragraph. This is page six of the administrative record. And they say the immigration judge found that although the evidence shows that Mexican officials sometimes engage in extrajudicial conduct, Mexican law provides criminal penalties for official corruption and prohibits arbitrary arrests and detention. And the Mexican government took steps to enforce those laws. So again, you have the first level cherry picking that happens before the immigration judge. And then what the board does is smashes all those together into one sentence to suggest that things are actually pretty good. Things are fine in Mexico. Yeah, there might be some issues, but they're making steps and the law is being enforced. And actually what the record shows is something quite different. The World Justice Project, this is at 529 of the record, suggests that torture happens in Mexico, not as sort of a rogue official here or there, or somebody who's really breaking the rules and the norms, but torture happens in Mexico because of the belief and the trust in torture by the Mexican government as a useful or effective form of evidence extraction. And this, again, lines up with the other pieces of the record, which suggests that police in Mexico, whether local, state, or federal, see people who are suspicious, who are new to the area, people with tattoos, people like Mr. Amaral, and then they have legal tools to arrest them without warrant, and they get engaged in torture, again, not because there's a couple of bad actors or bad apples, but because there's a belief and a trust in torture as a law enforcement tool. So, of course, the more likely than not has to be a particularized risk of torture. And the IJ relied on evidence, such as he lived in Mexico for a year after the shooting and wasn't harmed. The expert said only one third of the deportees are mistreated. He didn't think your client would be treated differently than any other recruit, and the other factors had showed he could relocate. So, again, under the standard of review, we have to be compelled to find that the determination, the agency's determination, was not supported by substantial evidence. So you're saying generally there's a risk there, but why was the IJ's conclusion not supported? Sure, so the judge does point out that, well, he lived for Mexico for another year after he was nearly murdered, and that's true, but he also described the times that he went to his grandmother's house as having to hide in the truck, covering himself with blankets, being afraid to go out. That's certainly not the life that we expect people to live at the standard where you could be safe in your country by hiding and not leaving your house, then it would be quite difficult for anyone to win CAT. And so the judge, again, I think states the fact of- Excuse me, how do we deal with the evidence that his enemies knew he was staying at his grandmother's house if they came over and said, is he's there or were his friends? And then he reported to his grandmother, no, those are the people who tried to shoot me, but yet nothing happened. That was another factor. Well, there was an expert witness in this case who was asked this exact same question. And he said that, quote, the fact that he spent a year there while keeping an extremely low profile in hiding doesn't necessarily mean the risk was gone in any way. That's at page 134 of the record. And he went on to say that in his experience, he's seen vendettas fulfilled sometimes five, 10 or 15 years later. So the fact that harm wasn't done to him immediately is not dispositive, especially when we consider the steps that he was taking to hide and stay safe. He wasn't going out and applying for a job or doing some of the things that we would expect a normal person to be doing. Didn't the expert say that his risk would be the same as any other new deportee and that it was unlikely people would know who he was? Well, I think what the expert said is that this number, this one third number is being thrown out by the agency and also by the respondent in this case. But I view that number as a baseline. And then the expert lists a number of complicating factors, things that can increase that risk, such as prior gang involvement, tattoos, being a recent deportee who speaks English and so on and so forth. And so I think that the expert did actually testify that he believed it was more likely than not that he would be tortured when taken in the totality of the circumstances. Certainly any deportee faces a risk and that's what the expert was saying. But then there's things that are going to increase that risk depending on the circumstances. And in this case, I think the idea that the person investigating him would need to know specifically who he was or where he was involved. I think that's kind of a misnomer that it's not a requirement that if the police arrest him because he looked suspicious that they would need to find out where he lived and what particular gang he was involved in. Well, speaking of the particular gang, wasn't part of the IJ's finding that this Florencia 13 gang had limited geographic influence so he could safely relocate elsewhere? Certainly. However, I think the experts testified that the Sereno gang has ties to the cartel Next Generation of Jalisco, which is one of the, according to the expert, the second most powerful cartel in Mexico. And so I disagree with that factual finding as well. And in fact, the record shows that the kind of torture that we're worried about where the police or rival gangs are looking out for suspicious people, this happens all over Mexico and Mexico City and other states. It's not so limited to his particular neighborhood and the record bears that out. And so the idea that if he went to Mexico City, somebody would not view him as suspicious just because he's not in Guadalajara, it just isn't borne out by the record. Right, but the problem, I mean, your burden is though, not just to show that, hey, there is a risk to him. You've got to meet the burden that torture is more likely than not. So in other words, more than a 50-50 proposition, right? Certainly, and cat is a high burden. It's a very high burden. However, I think in this case, and I guess I'm eating into my rebuttal time, but there's a lot of evidence to show that, again, it's not a limited geographical phenomenon that the police, again, state, local and federal arrest people who are suspicious and torture them. This is not just me saying it as his advocate, it's the expert who testified based on his research and experience as well. It's the State Department, it's the Amnesty International, it's all these different organizations that are coming out in the record. And so while the burden is high, I think that the point here is really that the agency made clear factual errors and errors that warrant a reversal. I'm gonna go ahead and reserve my time. All right, we'll hear from the government. Thank you. Good morning, your honors. Andrea Jebus on behalf of the Attorney General. This court should dismiss the instant petition for review because this case is moot. Petitioner abandoned his cat application when he requested that the court lift the stay and immediately return him to Mexico, the country of which he seeked deferral from removal. Petitioner had the legal protections of the stay, but willingly and wanted to return to the country he supposedly feared of torture. Alternatively, if this court would not find that Petitioner had abandoned his cat application, it has no remedy to provide Petitioner. Cat only prevents or defers removal to a specific country, which in this case is Mexico. However, like I mentioned, Petitioner proactively returned to the country on his own volition. There is no preventing his removal to Mexico. Can you address the ICE policy directive and the April 5th, 2016 letter and whether those policies are still in effect? Yes, your honor. The ICE policy is still in effect. I would like to mention though, your honor mentioned the Del Cid case. This case here is distinguishable from Del Cid in that in Del Cid, Petitioner was removed by ICE. Could I just confirm that both the policy directive itself, which is on the website and the April 15th, 2016 letter brief, which that's a different standard, are both still in effect with ICE? Correct, your honor. Okay, thank you. Yes, and I just would like to point out that Del Cid is distinguishable from the current case in that here, Petitioner requested a stay. Petitioner stayed in detention. Two months later, Petitioner asked this court to lift the stay. This court granted his request the following day and within the month, Petitioner was removed back to Mexico on his own request. He didn't voluntarily depart. He was removed. He asked the court to lift his stay, but that's not the same as leaving for Mexico on his own initiative. It is, your honor. He asked the court, he filed a motion, asked the court to lift the stay that he had, those legal protections that come with the stay. He asked the court and his words, he wanted immediate execution of his removal order to Mexico. He wanted DHS to send him back to Mexico, where this happened almost exactly a year ago. So Petitioner has been living in Mexico, according to the government's belief for the past year. This was on his own request that he returned to Mexico. But even so, if the policies are still in effect, then if we were to grant the petition, he would get some benefit from that, wouldn't he? If this court would grant an outright grant of capped protection, Petitioner would return to the United States as a non-citizen with a final order of removal, but has deferral from removal to Mexico. So he could go to a third country, but yes, if only with an outright grant of capped. So, but doesn't that possibility save it from mootness? I mean, if there's some relief that we could grant, then it can't be moot, can it? Well, that's the second point I mentioned. I would go more to the first point, Your Honor, on that Petitioner has abandoned his claim. Once he asked this court to let him stay, send him home, he no longer had an application. And this is- The petition was still pending before us. There was no request to dismiss the petition for review. There was no abandonment of that. So it would be abandoned only if leaving to Mexico ensured that we couldn't give him any relief. So I don't understand that argument. Well, the argument is, Your Honor, that he voluntarily asked this court. This is not like- But that has no effect. His voluntary departure has no effect unless you're telling me the policy wouldn't apply to him, but you've just told us it did. So it's irrelevant to us. It would seem whether he leaves for Mexico or not, his petition's still pending before us for review. But the government would argue that this is more similar to the assailant applicant who leaves the U.S. with advanced parole. There is a regulation that says he has abandoned that application. That seems like a reason- I mean, maybe that's a reason that the petition should fail on the merits under the regulation, but I don't see how that establishes mootness. I mean, as long as there is still a possibility of giving effective relief, which I think you've acknowledged there is. Excuse me, Your Honor. Go ahead. I think you have the questions. Oh, okay. So I would say that the volunteer, the fact that he, the government argues the fact that he requested for DHS to remove him with the stay that this court granted is more similar to the two recent cases that the government has cited in Ahmed and Martinez v. Barr, where this court did conclude that volunteer removal rendered his application for cap moot. And that was just a decision from a few months ago, Your Honor. The fact that he voluntarily asked to be removed to Mexico as opposed to Del Cid, where there was no stay and ICE proactively removed him. The government finds that that is a big distinguishing factor. So Martinez is an unpublished case. Is that correct? Correct, Your Honor. Okay, so you're just suggesting it's persuasive. Correct, Your Honor, as well as the Ahmed case. That is also unpublished and we are suggesting is very persuasive authority. Okay. Well, really, it's an open question before us as far as there is no binding precedent in the Ninth Circuit for your position. You're asking- Correct, Your Honor. There is no binding precedent that the government relies on. They are both persuasive authorities. And I'd like to just, Petitioner's counsel mentioned the reasons why he wanted to return. He mentioned isolation. Petitioner was isolated of his own request. When he was in the detention center, he asked to be in a single cell by himself and as opposed to DHS putting him in isolation. The government just wanted to make sure the court was aware of that distinguishing factor. And as for, if this court would not find that this case was moved, substantial evidence supports the agency's decision that Petitioner did not show it was more likely than not to, he would suffer torture in Mexico. So agency looked at two past things, the past torture and the future torture. And Petitioner's counsel talked about the agency cherry picking decisions. I just, the government would like to point out that this was a thorough decision. The immigration judge is 18 pages and the board was four pages, but what Petitioner pointed out with the board was also cited to the immigration judge. He cherry picked those. The agency provided many reasons why Petitioner would not win on the merits. The agency focused on the past torture, on how the drug rehabilitation claim that he sat in a chair for 24 hours constituted torture. The agency noted that that did not rise to the level of torture. As for the past harm he received at the hands of his fellow gang members, the agency discussed the no, excuse me, not discussed, found no acquiescence to that past harm. As for the future torture, the government, excuse me, the agency focused on government acquiescent as for Petitioner's ability to relocate, which in, as for the merits, Petitioner's counsel failed to mention or failed to discuss Dr. Slack's own expert testimony, which talked about that nothing would be unique to Petitioner if he did return. He is in the most popular category of returning young males, excuse me, young males who would want to recruit him for gang activity. They talked about 7% were kidnapped, 31% possible mistreatment. This is not getting over the more likely than not threshold. And as for the, one of the judges asked about the local gang, Petitioner in his own appeal brief to the board used the word local in describing the gang that Petitioner was a part of. And that can be found on page nine to 10. So if this court has any further questions, the government would ask that this petition for review be dismissed for mootness and alternatively denied on the merits. If Petitioner has not shown it was more likely than not that he would suffer torture in Mexico. Okay, I think you have a few minutes left for rebuttal. Okay, thank you, your honor. Thank you. So Dr. Slack did talk about, again, the baseline sort of harm that he sees in his research, but then he also testified about the factors that made Mr. Amaral's case unique, including his past membership in a gang, his criminal history, his tattoos, and that these were things that in Dr. Slack's opinion made it more likely than not that he would be tortured in Mexico. At the end of the day, we're lawyers and jurists, we're not mathematicians. And so it's hard to deal in percentages. What we have to do is get our hands dirty in the facts and figure out what the record says and what the record suggests. And in this case, I think that there's pretty unanimous agreement between our own State Department, Amnesty International, an expert who studies this particular issue, and others, other organizations and articles that suggest that there's a system in place in Mexico with police where they can arrest people lawfully if they're suspicious, that they systematically engage in torture because they think it's a good tool for law enforcement. And we know from Mr. Amaral's own experience, whether or not he was tortured, there was acquiescence or not when he was shot and the police told him, well, we kind of think that you deserved it because you're a member of a gang. There's some question about whether or not that's acquiescence or whether or not that's a failure to investigate. But if anything, it illustrates to us the attitude of the Mexican government towards Mr. Amaral. He was trying to leave the gang. And the police told him, well, you know, whatever. We can tell just by the way that you look that you probably had it coming. And that's exactly why he's afraid to live in Mexico and to seek the protection of the government. So we would ask that this court remand the case with a direction to have cat granted. Thank you. I thank both sides for their argument. In the case of Julio Amaral Lopez versus Garland is submitted and with that, we're adjourned for this session. All rise.
judges: Gilman, IKUTA, MILLER